# IN THE SUPREME COURT OF CALIFORNIA

NEW ENGLAND COUNTRY FOODS, LLC,
Plaintiff and Appellant,

v.

VANLAW FOOD PRODUCTS, INC.,
Defendant and Respondent.

S282968

Ninth Circuit
22-55432

Central District of California
8:21-cv-01060-DOC-ADS

April 24, 2025

Justice Liu authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Kruger, Groban, Jenkins, and Evans concurred.

NEW ENGLAND COUNTRY FOODS, LLC v. VANLAW
FOOD PRODUCTS, INC.

S282968


Opinion of the Court by Liu, J.


This case concerns the scope of Civil Code section 1668's rule that parties may not contract away liability for "willful injury to the person or property of another." (All undesignated statutory references are to the Civil Code.) Plaintiff New England Country Foods, LLC (NECF) alleges that VanLaw Food Products, Inc. (VanLaw) intentionally undercut its business by secretly promising to replicate NECF's popular barbeque sauce and sell it directly to Trader Joe's. NECF sued VanLaw in federal court, alleging tortious interference and other claims. The district court dismissed the case based on a clause limiting damages in a manufacturing contract between the parties. The United States Court of Appeals for the Ninth Circuit asked us whether a contract clause that substantially limits damages for intentional wrongdoing is invalid under section 1668. We hold that a limitation on damages for willful injury to the person or property of another is invalid under section 1668.

**I.**

We assume the truth of the facts alleged in NECF's operative complaint. (*Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130, 1137–1138.) NECF is a Vermont company that began selling its barbeque sauce to Trader Joe's in 1999. The sauce, labeled "TJ's Bold & Smoky Kansas City Style Barbecue Sauce," was quite popular. NECF initially made the sauce in-

house but later decided to outsource manufacturing to VanLaw. In 2015, the parties entered into a contract under which VanLaw would provide manufacturing, shipping, and billing services for NECF's sales of barbeque sauce to Trader Joe's. The contract included a provision prohibiting VanLaw from reverse-engineering the barbeque sauce.

The contract also contained provisions limiting the parties' possible damages. A "Limitation on Liability" clause provided: "To the extent allowed by applicable law: (a) in no event will either party be liable for any loss of profits, loss of business, interruption of business, or for any indirect, special, incidental or consequential damages of any kind, even if such party has been advised of the possibility of such damages; and (b) each party's entire liability to the other party for damages concerning performance or nonperformance by such party in any way related to the subject matter of this Agreement, and regardless of the form of any claim or action, will not exceed the amount of gross revenues earned by [VanLaw] or NECF from the Products, whichever is greater, for the twenty-four (24) months prior to the events giving rise to the alleged liability." An indemnification provision further provided that "in no event shall either party be liable for any punitive, special, incidental or consequential damages of any kind (including but not limited to loss of profits, business revenues, business interruption and the like), arising from or relating to the relationship between [VanLaw] and NECF, regardless of whether the claim under which such damages are sought is based upon breach of warranty, breach of contract, negligence, tort, strict liability, statute, regulation or any other legal theory or law, even if

either party has been advised by the other of the possibility of such damages."

NECF alleges that as the expiration of the three-year contract neared and the parties began negotiating terms of renewal, VanLaw hatched a backup plan in case negotiations broke down: it would clone NECF's barbeque sauce and sell it directly to Trader Joe's. VanLaw's president laid the groundwork in e-mails to Trader Joe's, which NECF later discovered in separate litigation regarding sriracha sauce. NECF and VanLaw failed to agree on terms for renewal. NECF asserts that because of VanLaw's promise to clone the barbeque sauce, Trader Joe's ended its decades-long relationship with NECF. VanLaw was ultimately unable to replicate the barbeque sauce, and Trader Joe's stopped selling it altogether.

NECF sued VanLaw in federal court, claiming breach of contract, intentional interference with contractual relations, intentional interference with prospective economic relations, negligent interference with prospective economic relations, and breach of fiduciary duty. NECF sought $6 million in past and future lost profits and punitive damages.

The district court granted VanLaw's motion to dismiss the complaint based on the contract provisions limiting damages. (*New England Country Foods, LLC v. VanLaw Food Products, Inc.* (C.D.Cal., Nov. 23, 2021, No. SA CV 21-01060-DOC-ADS) 2021 WL 6751898.) The court reasoned that the contract allowed only for direct damages and injunctive relief, whereas NECF sought lost profits, attorneys' fees and costs, and punitive damages. (*Id.* at p. *5.) The court rejected NECF's argument that parties cannot limit damages for future intentional conduct under section 1668, reasoning that it "merely acts to prevent

NEW ENGLAND COUNTRY FOODS, LLC. v. VANLAW FOOD
PRODUCTS, INC.

Opinion of the Court by Liu, J.

contracts that completely exempt parties from liability, not simply limit damages." (*New England Country Foods, LLC v. VanLaw Food Products, Inc.*, *supra*, at p. *5.) The district court granted leave to amend to seek remedies allowed under the contract "and/or to plead why the available remedies are unavailable or so deficient as to effectively exempt [VanLaw] from liability." (*Ibid.*)

NECF filed an amended complaint, adding allegations that "the only possible harm . . . from the wrongs committed by [VanLaw] are a loss of profits" and thus the "limitation-of-liability provisions . . . if applied, would completely exempt [VanLaw] from liability from the wrongs alleged herein." The district court dismissed the amended complaint, this time with prejudice. (*New England Country Foods, LLC v. VanLaw Food Products, Inc.* (C.D.Cal., Jan. 20, 2022, No. SA CV 21-01060-DOC-ADS) 2022 WL 266050.) Citing the rule that parties may bargain to limit liability for a breach of contract, the court noted that it could "not erase bargained-for contract provisions simply because one party now wishes they were different." (*Id.* at p. *3.) Regarding section 1668, the court noted that the limitation provisions in the contract did not bar all money damages but merely limited them to specific types of damages that NECF did not suffer. (*New England Country Foods, LLC v. VanLaw Food Products, Inc.*, *supra*, at p. *3.) The court relied on *Food Safety Net Services v. Eco Safe Systems USA, Inc.* (2012) 209 Cal.App.4th 1118 (*Food Safety*), which found that a limitation on damages barred recovery for a breach of contract.

NECF appealed. After oral argument, the Ninth Circuit asked us to decide the following question: "Is a contractual clause that substantially limits damages for an intentional

NEW ENGLAND COUNTRY FOODS, LLC. v. VANLAW FOOD PRODUCTS, INC.

Opinion of the Court by Liu, J.

wrong but does not entirely exempt a party from liability for all possible damages valid under California Civil Code Section 1668?" (*New England Country Foods, LLC v. VanLaw Food Products, Inc.* (9th Cir. 2023) 87 F.4th 1016, 1018, italics omitted (*New England Country Foods*).)

## II.

Section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

Section 1668 expresses "traditional skepticism concerning agreements designed to release liability for future torts." (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 754 (*City of Santa Barbara*); see also *Tomerlin v. Canadian Indem. Co.* (1964) 61 Cal.2d 638, 648 ["Section 1668 of the Civil Code and section 533 of the Insurance Code establish a public policy to prevent insurance coverage from encouragement of wilful tort."].) " 'Whereas contract actions are created to enforce the intentions of the parties to the agreement, tort law is primarily designed to vindicate "social policy." ' " (*Rattagan v. Uber Technologies, Inc.* (2024) 17 Cal.5th 1, 19 (*Rattagan*).) Thus, contractual releases of tort liability threaten to undermine our tort system's goal of maintaining community standards of conduct and ensuring wrongdoers compensate those they harm. (*City of Santa Barbara*, at p. 754.) Section 1668 prevents parties "from granting themselves licenses to commit future aggravated wrongs." (*Castelo v. Xceed Financial Credit Union* (2023) 91 Cal.App.5th 777, 789 (*Castelo*).)

Our cases have examined the application of section 1668 to negligent tortious conduct. In *Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92, 98–101, we addressed ordinary negligence, holding that releases of liability are invalid if they affect the public interest as assessed under six factors. (See *Henrioulle v. Marin Ventures, Inc.* (1978) 20 Cal.3d 512, 517–519 [applying the *Tunkl* factors to a release for negligence in a residential lease]; *Westlake Community Hospital v. Superior Court* (1976) 17 Cal.3d 465, 479–480 (*Westlake Community Hospital*) [release in hospital bylaws].) In *City of Santa Barbara*, we addressed gross negligence and held that "public policy generally precludes enforcement of an agreement that would remove an obligation to adhere to even a *minimal* standard of care." (*City of Santa Barbara, supra*, 41 Cal.4th at p. 777.)

This case implicates section 1668's prohibition on releases of liability for "willful injury to the person or property of another." As a threshold matter, it is important to distinguish between NECF's causes of action for breach of contract and those for violations of non-contractual duties. We address this distinction further below. (*Post*, at pp. 16–18.) The certified question concerns three causes of action for independently tortious conduct: intentional interference with contractual relations, intentional interference with prospective economic relations, and breach of fiduciary duty. (*New England Country Foods, supra*, 87 F.4th at p. 1021.) For purposes of answering the certified question, we assume without deciding that these causes of action allege "willful injury" under section 1668.

**A.**

Before turning to the question presented, we clarify that
no context-dependent analysis is required to determine whether
a particular release of liability for "willful injury" is barred by
section 1668. VanLaw asks us to endorse a "case-by-case"
approach, suggesting that section 1668 does not apply here
because the parties are private commercial entities that
bargained for the clauses. Releases for "willful injury," however,
"*are* against the policy of the law." (§ 1668, italics added.)

We implicitly recognized as much in *Westlake Community
Hospital*, where a doctor alleged that a hospital revoked her
staff privileges in a conspiracy to destroy her medical practice.
(*Westlake Community Hospital*, *supra*, 17 Cal.3d at pp. 469–
470.) The doctor brought tort claims against the hospital for
intentional interference with the right to pursue a lawful
occupation, conspiracy to restrain competition, intentional
infliction of emotional distress, and fraud. (*Id.* at p. 470.) We
easily disposed of a release of liability in hospital bylaws "insofar
as the provision in question purports to bar a plaintiff's claim
based on the *intentional* wrongdoing of the hospital or its staff,
as is alleged in the instant case." (*Id.* at p. 479.) Without any
context-dependent analysis, we said the plain language of
section 1668 "leaves no doubt that the provision is invalid."
(*Ibid.*)

Allowing parties to release liability for willful injury based
on the context would also be incongruous with *City of Santa
Barbara*, where we held that attempts to eliminate liability for
gross negligence are categorically unenforceable. (*City of Santa
Barbara*, *supra*, 41 Cal.4th at p. 762; see also *id.* at p. 782 (conc.
& dis. opn. of Kennard, J.) ["The majority . . . [concludes] that

releases for gross negligence are *inherently* and *generally* against public policy and unenforceable."].)  We declined to apply "*Tunkl*'s public interest analysis focus[ing] upon the overall transaction," such as the underlying service and the bargaining relationship of the parties, to releases for gross negligence.  (*Id.* at p. 762.)  Instead, we said a categorical rule is justified by the "degree or extent of the misconduct" inherent to gross negligence and the public policy of discouraging aggravated wrongs.  (*Id.* at p. 764.)  Given our rejection of a " 'transaction-focused' analysis" for gross negligence (*ibid.*), it would be inconsistent to adopt such an analysis for conduct that rises to the level of willful wrongdoing.

The rule that parties may not contract away liability for willful injury is well established and widely recognized.  (See *City of Santa Barbara, supra,* 41 Cal.4th at p. 760, fn. 19 [collecting treatises addressing willful injury and gross negligence]; *id.* at p. 761, fn. 20 [collecting law review articles].)  A note to the original version of section 1668 cites a concurrence in a New York case from 1862 stating:  "That a party should be permitted to contract, that he may with impunity inflict wanton injury upon others, is repugnant to every sentiment of justice and propriety."  (*Perkins v. New York Cent. R.R. Co.* (1862) 24 N.Y. 196, 211 (conc. opn. of Selden, C. J.).)  While ordinary negligence may be released in some circumstances under *Tunkl*, there is no similar flexibility for willful injury.  (*Epochal Enterprises, Inc. v. LF Encinitas Properties, LLC* (2024) 99 Cal.App.5th 44, 61 (*Epochal Enterprises*) [explaining that *Tunkl* did not add a "public interest" requirement for releases of conduct beyond ordinary negligence].)

**B.**

With that backdrop, we now turn to the question in this case.  We hold that limitations on damages for willful injury to the person or property of another are prohibited by section 1668.

In construing section 1668, our task " 'is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' "  (*Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 837.) Section 1668 bars "contracts which have for their object, directly or indirectly, to exempt anyone from responsibility" for conduct within its ambit.  The Ninth Circuit noted that the word " 'exempt' . . . may indicate that only provisions that categorically bar all liability are invalid.  However, when read within its broader context . . . the term 'exempt' may be interpreted to mean that even liability provisions that bar only certain kinds of damages run afoul of this statute, because they could have the indirect effect of effectively exempting a party from liability."  (*New England Country Foods*, *supra*, 87 F.4th at p. 1020.)

We conclude that the Legislature did not intend to allow parties to privately negotiate how much they are willing to pay to inflict willful injury.  Beginning with the language of the statute, we do not read the word "exempt" to mean that section 1668 bars only full releases of liability.  First, the phrase "exempt . . . *from responsibility*" does not necessarily mean exempt from *all possible* responsibility.  (§ 1668, italics added.) As VanLaw acknowledges, "exempt" means "free or released from some liability or requirement to which others are subject." (Merriam-Webster Dict. Online (2025) <http://www.merriam-webster.com/dictionary/exempt> [as of April 24, 2025]; all

Internet citations in this opinion are archived by year, docket number, and case name at <https://courts.ca.gov/opinions/cited-supreme-court-opinions>.) Certainly, a limitation on damages that would otherwise be available for tortious conduct — and for which another tortfeasor would be responsible for paying — constitutes a release of responsibility. (See *Donlon Bros. v. Southern Pacific Co.* (1907) 151 Cal. 763, 769 ["[A] limitation of liability necessarily imports a responsibility less than full responsibility."].)

The language surrounding the word "exempt" also suggests that section 1668 should be read broadly. It applies to "contracts which *have for their object*, directly *or indirectly*, to exempt anyone from responsibility." (§ 1668, italics added.) Thus, section 1668 applies not just to releases that expressly shield parties from responsibility, but also to provisions that, perhaps in an indirect or creative way, aim to have the same effect. The surrounding language serves to broaden, not narrow, the scope of section 1668.

Importantly, reading section 1668 to apply to limitations on damages effectuates its purpose of safeguarding our tort system. (*Castelo*, *supra*, 91 Cal.App.5th at p. 789 ["The purpose of the statute is to prohibit parties from granting themselves licenses to commit future aggravated wrongs."].) As noted, tort law arises from social policy, imposing duties on every community member for the protection of every other community member. (§ 1708 ["Every person is bound, without contract, to abstain from injuring the person or property of another"].) Although private parties have wide latitude to form contracts, that latitude is bounded by these broader social policies. And our tort system's concern with vindicating social policy is at its

zenith when it comes to willful wrongs. For example, insurance companies may not contract to provide coverage for "willful torts." (*J. C. Penney Casualty Ins. Co. v. M. K.* (1991) 52 Cal.3d 1009, 1021 ["The public policy underlying [Insurance Code] section 533 is to discourage willful torts."].) Similarly, permitting contracts that reduce accountability for willful harm would effectively allow parties to put a price on violating our social policy against such harm.

Our conclusion is also consistent with the weight of authority that limitations on damages are invalid in the same circumstances as full releases. (1 Witkin, Summary of Cal. Law (11th ed. 2024) Contracts, § 679 ["Limitation of liability provisions are valid in similar circumstances" as exemptions from liability].) "[S]ection 1668 has . . . been applied to invalidate provisions that merely limit liability." (*Health Net of California, Inc. v. Department of Health Services* (2003) 113 Cal.App.4th 224, 239 (*Health Net*).) Although these cases did not address section 1668's "willful injury" language, they suggest that limitations on damages and full releases are barred to the same extent.

In *Klein v. Asgrow Seed Co.* (1966) 246 Cal.App.2d 87, 92, the court addressed a warranty for a sale of tomato seeds that limited damages to the purchase price. The seller marketed the seed as a particular "early maturing" tomato despite knowing that the seeds contained a mix of late maturing " 'rogues,' " and the plaintiffs lost half a field of tomatoes. (*Id.* at pp. 90–91, 94.) The court first concluded that the warranty did not limit damages where the seller "knowingly and deliberately" misrepresented the type of seed. (*Id.* at p. 99.) Alternatively, the court reasoned that "[h]ad there been such an agreement it

11

would have been void" under section 1668, citing an Agriculture
Code provision prohibiting the sale of seeds with false labeling.
(*Klein*, at p. 99; see also *Pink Dot, Inc. v. Teleport
Communications Group* (2001) 89 Cal.App.4th 407, 413 [citing
section 1668 for the proposition that rules limiting liability for
public utilities " 'do not apply to situations which involve willful
misconduct' "].)

Similarly, the court in *Food Safety* addressed a provision
in a contract to perform a study of food disinfection equipment
that excluded consequential damages and lost profits. (*Food
Safety*, *supra*, 209 Cal.App.4th at p. 1126.) In analyzing the
validity of the limitation on damages, the court applied
unconscionability principles to the breach of contract claim and
*Tunkl*'s public interest factors to the negligence claim,
upholding the clause in both instances. (*Food Safety*, at
pp. 1125–1128.) When it turned to the fraud claim, however,
the court treated the limitation on damages as falling within the
restrictions of section 1668, citing the statute and a case
addressing a full release for the rule that "limitation of liability
clauses are ineffective with respect to claims for fraud and
misrepresentation." (*Food Safety*, at p. 1126.) The court
ultimately concluded that the fraud claim failed under the
economic loss rule because the plaintiff had not established
tortious conduct independent of breach of contract. (*Id.* at
p. 1130.)

In *Health Net*, a contract between a state agency and a
health plan provider excluded money damages and restricted
recovery to equitable relief. (*Health Net*, *supra*, 113 Cal.App.4th
at pp. 226–227.) The court held that the provision violated
section 1668 because it purported to limit liability for a violation

of the Welfare and Institutions Code. (*Health Net*, at p. 235.)
Responding to the argument that the clause was a limitation on
liability, not a complete exemption, the court reasoned that "an
exculpation of any liability for *any* damages for *any* statutory
violation surely rises to the level of an 'exempt[ion] from
responsibility' within the meaning of the plain language of
section 1668." (*Id.* at p. 239.) The court declined to decide
whether a limitation on remedies conceivably could survive
section 1668, noting that "there is assuredly a point at which a
limitation . . . reaches the point of constituting an
'exempt[ion].' " (*Health Net*, at p. 239.) Most recently, the court
in *Epochal Enterprises* addressed a commercial lease in which
the tenant waived consequential damages or lost business
profits. (*Epochal Enterprises*, *supra*, 99 Cal.App.5th at p. 49.)
Observing that "section 1668 also applies 'to invalidate
provisions that merely limit liability,' " the court concluded that
the waiver was invalid "to the extent the limitation of liability
clause purports to release defendants for liability for failing to
disclose asbestos." (*Id.* at pp. 60, 61.)

Courts in other jurisdictions have also applied the rule
that releases of liability for "willful or wanton" conduct are
against public policy without distinguishing between limits and
full releases. (See, e.g., *Moore v. Waller* (D.C. 2007) 930 A.2d
176, 179 [" '[C]ourts have not generally enforced exculpatory
clauses to the extent that they limited a party's liability for gross
negligence, recklessness or intentional torts.' "]; *New Light Co.,
Inc. v. Wells Fargo Alarm Services* (Neb. 1994) 525 N.W.2d 25,
30 [agreeing with New York authority that "public policy with
regard to gross negligence and willful and wanton misconduct
applies both to clauses attempting to exculpate liability and

clauses attempting to limit damages to a nominal sum"]; *I.C.C. Metals, Inc. v. Municipal Warehouse Co.* (N.Y.Ct.App. 1980) 431 N.Y.S.2d 372, 376 ["[P]rior limitations [on liability] may not properly be applied so as to diminish one's liability for injuries resulting from an affirmative and intentional act of misconduct."]; *U.S. Fire Ins. Co. v. Sonitrol Management Corp.* (Colo.Ct.App. 2008) 192 P.3d 543, 548 [holding that the general rule that releasing liability for willful and wanton conduct is against public policy "applies to both exculpatory and limitation of liability clauses"]; *Butler Mfg. Co. v. Americold Corp.* (D.Kan. 1993) 835 F.Supp. 1274, 1282 [noting that Kansas Supreme Court decisions "reflect[] that provisions limiting liability for gross, wanton or willful conduct [will] not be permitted"]; *Peck v. Rollins Protective Services, Inc.* (Ga.Ct.App. 1988) 375 S.E.2d 494, 496 [" 'A clause in a contract limiting one's liability for negligent acts does not serve to limit one's liability for wilful and wanton conduct.' "].)

The Ninth Circuit identified two Court of Appeal cases suggesting that a limitation on damages may be valid under section 1668.  Both cases are largely distinguishable, and we disapprove of them to the extent they suggest a limitation on damages for willful injury may be valid in some circumstances.

In *Farnham v. Superior Court* (1997) 60 Cal.App.4th 69, 71–72 (*Farnham*), an employment contract allowed an employee to arbitrate against his corporate employer but waived his right to sue the officers, directors, or shareholders for claims arising out of the contract.  The employee sued the company and two directors for breach of contract and defamation.  (*Ibid.*)  After the employee won $1.5 million at arbitration (including $500,000 for the defamation claim) against the corporation, the

trial court sustained a demurrer against the directors based on the waiver. (*Id.* at pp. 72–73.) Extending *Tunkl*'s reasoning that releases for ordinary negligence are valid in some circumstances, the court said "it follows that a contractual *limitation* on the liability of directors for defamation arising out of their roles as directors" can be valid where "the injured party retains his right to seek redress from the corporation." (*Id.* at p. 77.) At the same time, the court explained that the enforceability of the limitation could not be resolved on demurrer because enforceability may turn on whether the directors were "acting as individuals and for their own self-interests (that is, not for the benefit of [the corporation]) when they defamed Farnham" (*id.* at p. 77, fn. 6) or whether the corporation is "insolven[t]" or "unable to satisfy Farnham's judgment" (*id.* at p. 78, fn. 8).

The *Farnham* court thus addressed only *whom* an employee could recover from where the alleged misconduct was for the benefit of the employer. Importantly, the court explained that "the provision *would* violate section 1668 if read to include any and all wrongful acts by [the directors], without regard to whether those acts were related to their roles as directors of [the corporation]." (*Farnham*, *supra*, 60 Cal.App.4th at p. 77, fn. 6.) Relatedly, the court believed the employee was seeking "another bite at the defamation apple" because he had already won against the corporation and "want[ed] to litigate the identical claim against [the directors]." (*Id.* at pp. 76–77.) The court expressed skepticism that any additional damages were available (*id.* at p. 77), noting that there was nothing suggesting the corporation could not satisfy its judgment (*id.* at p. 78, fn. 8) and that a motion was pending to add the directors as debtors

to the judgment against the corporation (*id.* at p. 77, fn. 5).
Finally, the court "express[ed] no view" on the waiver if the
employee had "alleged fraud or some other intentional tort." (*Id.*
at p. 77, fn. 7.)

The other case is *CAZA Drilling (California), Inc. v. TEG
Oil & Gas U.S.A., Inc.* (2006) 142 Cal.App.4th 453, 457, where a
drilling company's negligence allegedly caused an oil well
blowout. The court held that an exculpatory clause in the
drilling contract "did not implicate the public interest in the way
required to abrogate exculpatory provisions limiting liability for
negligence under *Tunkl.*" (*Id.* at p. 470.) The court also
addressed the argument that the clause was invalid under
section 1668 because the drilling company had violated statutes
and regulations. (*CAZA*, at p. 470.) The court provided two
alternative grounds for upholding the clause: (1) the clause did
not exempt the company from all liability "but merely limit[ed]
its responsibility with respect to economic damages" (*id.* at
p. 471), and (2) in any event, the appellants failed to identify a
violated law or regulation that would trigger section 1668.
(*CAZA*, at pp. 457, 476–478.) Because *CAZA* addressed
negligence, not intentional torts, and viewed section 1668 as
inapplicable because of no triggering statutory or regulatory
violation, it has no bearing here.

In light of the language and purpose of the statute, the
policy discouraging willful tortious conduct, and the general
agreement in case law that limits on liability and full releases
are treated similarly, we hold that limitations on damages for
willful injury to the person or property of another are invalid
under section 1668.

## C.

Because NECF suggests that section 1668 applies not only to willful tortious conduct but also to willful breaches of contract, a further clarification is warranted: Section 1668 does not preclude parties from limiting their liability for pure breaches of contract absent a violation of an independent duty that falls within the ambit of section 1668. Where the claims asserted are "nothing more than a breach of . . . contractual obligations," section 1668 does not apply. (*Food Safety*, *supra*, 209 Cal.App.4th at p. 1125.) In such cases, releases are governed by contract principles such as unconscionability. (*Id.* at p. 1126.) This approach is consistent with the California Uniform Commercial Code, which applies to various commercial transactions and explicitly allows parties to exclude consequential damages and limit their remedies. (Cal. U. Com. Code, § 2719, subd. (3).)

Reading section 1668 to encompass intentional breaches of contract would erode fundamental distinctions between contract law, which is meant to enforce promises of individual parties, and tort law, which is meant to vindicate social policy. (*Rattagan*, *supra*, 17 Cal.5th at p. 19.) "[T]he law generally does not distinguish between good and bad motives for breaching a contract." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 516.) And "motivation is irrelevant" for assessing available damages in contract cases. (*Id.* at p. 517.) Even where a party breaches for "nefarious or unethical reasons," the party is deemed to have "done nothing more socially opprobrious than to fall short in meeting a contractual commitment." (*Ibid.*) Thus, "[i]n the absence of an independent tort, punitive damages may not be awarded for breach of

contract 'even where the defendant's conduct in breaching the contract was wilful, fraudulent, or malicious.' " (*Id.* at p. 516.)

There are mechanisms for ensuring that parties cannot proceed in tort for what are essentially breaches of contract. " ' " '[A]n omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty.' " ' " (*Rattagan*, *supra*, 17 Cal.5th at p. 19.) And under the economic loss rule, contractual parties may not recover in tort " 'unless [the party] can demonstrate harm above and beyond a broken contractual promise.' " (*Id.* at p. 20; see *Food Safety*, *supra*, 209 Cal.App.4th at pp. 1126, 1130 [noting that limitations of liability are invalid for fraud but applying the economic loss rule to bar a fraud claim].) As we have acknowledged, whether a harm arises independently from a contract can be a "nuanced question." (*Rattagan*, at p. 26.)

Many of VanLaw's arguments for upholding the limitation provisions here are rooted in its position that NECF asserts nothing more than a contractual breach of the reverse-engineering provision "couched" as a tort. But whether NECF has adequately alleged torts independent of a breach of contract is not before us, and we express no view. (See generally *Rattagan*, *supra*, 17 Cal.5th at p. 24 ["[E]xistence of a contractual relationship between two parties does not mean one party can tortiously injure the other but limit its liability to a contract remedy."].) As noted, we assume without deciding that NECF has adequately alleged willful tortious conduct independent of any breach of contract.

## CONCLUSION

We hold that section 1668 invalidates limitations on damages for willful injury to the person or property of another.

**LIU, J**.

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  New England Country Foods, LLC v. VanLaw Food Products, Inc.

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding** XX on request by 9th Circuit (Cal. Rules of Court, rule 8.548)
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S282968
**Date Filed:**  April 24, 2025

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

M.K. Hagemann and Michael K. Hagemann for Plaintiff and Appellant.

Magarian & DiMercurio, Mark D. Magarian and Krista L. DiMercurio for Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Michael K. Hagemann
M.K. Hagemann, P.C.
1801 Century Park East, Suite 2400
Century City, CA 90067
(310) 773-4902

Krista L. DiMercurio
Magarian & DiMercurio, APLC
20 Corporate Park, Suite 255
Irvine, CA 92606
(714) 415-3412